PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CASE NO.  1:25-cr-33 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| DEANGELO O. SMITH, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) | **AND ORDER** |

## I.     INTRODUCTION

Defendant Deangelo Smith pled guilty to being a Felon in Possession of a Firearm and/or Ammunition, in violation of 18 U.S.C. § 922(g)(1), pursuant to a written plea agreement.  ECF No. 12.  Because the Government claims that Defendant breached the plea agreement by committing additional crimes while in pretrial detention, the Government asks to be released from its obligations under the plea agreement.  ECF No. 24 [SEALED]; ECF No. 26.  In response, Defendant does not contest his involvement in an incident that resulted in the death of a detainee.  ECF No. 28.  He argues, however, that his conduct was justified self-defense.

The Court heard argument at the sentencing hearing, conducted on November 20, 2025, and concluded that Defendant breached the plea agreement without justification, that he was not entitled to a reduction for acceptance of responsibility, and that 18 U.S.C. § 3553(a) factors supported an upward variance.  Below, the Court further explains why it imposed a 96-month term of incarceration.

(1:25CR33)

## II.     BACKGROUND

### A.  Offense Conduct

On June 4, 2024, Defendant began a three-year term of supervised release after completing a 120-month sentence for armed robbery.  *See* Case No. 1:16CR204-JRA.  About five months later, on November 29, 2024, Defendant was arrested by agents from the Ohio Investigation Unit who were investigating activities near Mookies Beverage, a liquor store in North Randall, Ohio, when they observed four men leave a parked Jeep and enter the liquor store.  Gov't Sent'g Memorandum, ECF No. 26 at PageID #: 172; Present'g Investigation Rep. [SEALED], ECF No. 16, ¶ 7.  The agents ran the Jeeps' license plate and discovered the driver had outstanding warrants for his arrest.  ECF No. 16, ¶ 7.  After the men had re-entered the Jeep and left the parking lot, agents executed a traffic stop.  Defendant was seated in the back on the driver's side.  ECF No. 16, ¶ 7.

Approaching the vehicle, agents observed open containers of what they suspected was alcohol.  When asked they if the occupants had any weapons, the other back-seat passenger stated no.  Defendant did not respond.  ECF No. 16, ¶ 8.  After asking Defendant and the other back-seat passenger to exit the vehicle, the agents observed a firearm at the feet of the other back-seat passenger.  ECF No. 16, ¶ 8; ECF No. 26 at PageID #: 173.  Having secured the loaded firearm, the agents returned to Defendant (who was still sitting in the Jeep) and asked if he had a weapon.  This time Defendant replied that he had a gun in his waistband.  Agents seized a loaded SCCY CPX-2 9mm handgun from Defendant's waistband.  ECF No. 16, ¶ 8.  They also seized a green pill from Defendant's pocket that later tested positive for methamphetamine.  ECF No. 16, ¶¶ 9–10.

(1:25CR33)

> At all relevant times, Defendant was prohibited from possessing a firearm and ammunition.

> On January 23, 202, Defendant was indicted for violating 18 U.S.C. § 922(g)(1).  ECF No. 1.  Defendant waived his right to a detention hearing and was held in pretrial detention at the Northeast Ohio Corrections Center ("NEOCC").  Min. of Procs. [non-document] Initial Appearance/Arraignment (Jan. 28, 2025).

### B.  *Plea Agreement*

> On April 8, 2025, Defendant entered a plea agreement with the Government.  Because the plea agreement was pursuant to Fed. R. Crim. P. 11(c)(1)(B), it also correctly stated that "recommendations of the parties [would] not be binding upon the Court."  ECF No. 12, ⁋ 15. *See also* Fed. R. Crim. P. 11(c)(1)(B) ("…such a recommendation or request does not bind the court").

> The parties agreed that Defendant's offense level would be 20 under U.S.S.G. § 2K2.1(a)(4)(A).  The plea agreement provides that "[t]he USAO has no reason to believe at this time that Defendant has not clearly and affirmatively accepted personal responsibility for [his] criminal conduct."  ECF No. 12, ⁋ 18.  Against that backdrop, the Government agreed that it would recommend a three-level reduction for acceptance of responsibility, "provided Defendant's conduct continues to reflect [] acceptance of responsibility."  *See* U.S.S.G. § 3E1.1(a) – (b).  This three-level downward adjustment would have resulted in a stipulated final offense level of 17.  ECF No. 12, ⁋ 18.

> While the plea agreement makes it clear that there is no agreement as to Defendant's criminal history, the parties anticipated that Defendant would be Criminal History Category III and that his advisory guidelines range would be 30–37 months.  The parties agreed that

(1:25CR33)

Defendant could request—without objection from the Government—a 30-month sentence, the low end of the expected under the sentencing guidelines.  ECF No. 12, ¶¶ 14, 17.

The plea agreement cautioned Defendant that he does not have the right to withdraw his guilty plea if the Court rejects the parties' sentencing recommendations or if he is dissatisfied with his sentence.  ECF No. 12, ¶ 15.  The agreement also explained the consequences Defendant would face if he breached the plea agreement.  The agreement states:

> Defendant understands that if Defendant breaches any promise in this agreement, ***commits additional crimes***, obstructs justice, attempts to withdraw [his] guilty plea, or if [his] guilty plea is rejected by the Court or is vacated or set aside, the USAO will be released from all of its obligations under this agreement and may institute or maintain any charges and may make any recommendations with respect to sentencing that otherwise would be prohibited under the terms of the agreement. Defendant understands, however, that a breach of the agreement by Defendant will not entitle Defendant to withdraw, vacate, or set aside Defendant's guilty plea or conviction.  Defendant understands that the USAO has the right to use any statement Defendant gives under oath in a prosecution for perjury or false statement.

ECF No. 12, ¶ 26 (emphasis added).

While the plea agreement did not leave much to Defendant's imagination, during the plea colloquy, after placing Defendant under oath and finding him to be competent to plead guilty and understand the consequences of having done so, the Court carefully reviewed the plea agreement, including the sections above, with Defendant.  Min. of Procs. [non-document] Change of Plea Hr'g (May 13, 2025).  Several times during the plea colloquy, the Court painstakingly explained that it was not promising or obligated to impose a 30-month sentence. In fact, the Court advised Defendant to bring his "A game" to the sentencing hearing because it was hard for the Court to imagine why a 30-month term of imprisonment would be appropriate given how soon Defendant committed a new crime after completing a ten-year sentence.

4

(1:25CR33)

Because Defendant was in violation of an active term of supervised release, the Court advised him that it could impose his sentence consecutively to any new term of incarceration given for the violation of his supervised release.  Ultimately, the Court only promised to keep an open mind regarding whether a 30-month term would be sufficient.  And, of equal importance, more than once during the plea colloquy, the Court emphasized to Defendant that his breach of the plea agreement would mean that he would lose its benefits and protections.  Knowing and understanding these things, Defendant pled guilty of his own free will and without unwritten inducements or promises and without threats or coercion.  On May 13, 2025, the Court accepted Defendant's plea of guilty and approved his plea agreement.

### C.  Presentence Investigation Report

The Presentence Investigation Report ("PSR") agreed with the guidelines calculation recommended by the plea agreement.  ECF No. 16.  The PSR calculated Defendant's offense level at 20, pursuant to U.S.S.G. § 2K2.1(a)(4)(A).  A two-level reduction was applied because Defendant "clearly demonstrated acceptance of responsibility for the offense."  Another level reduction was applied because Defendant assisted authorities in investigating his conduct by timely notifying authorities of his desire to plead guilty.  ECF No. 16, ¶¶ 23–24.  Defendant's total offense level is calculated at 17.  ECF No. 16, ¶¶ 23–24.

Defendant's criminal history score was calculated as six points, placing him in Criminal History Category III.  The PSR noted three prior convictions that contributed to this score: (1) a 2014 state-court conviction for attempted carrying a concealed weapon contributed one point; (2)

5

(1:25CR33)

a 2016 municipal-court conviction for theft and falsification contributed two points; and (3) a 2016 federal conviction for armed robbery contributed three points.[1]  ECF No. 16, ¶¶ 28–30.

Based on the PSR's calculation, Defendant's advisory sentencing guidelines range for an offense level of 17 with a Criminal History Category III was indeed 30–37 months.  Without a three-level reduction for acceptance of responsibility, however, Defendant's Sentencing Guideline range for an offense level of 20 with a Criminal History Category III is 41–51 months. The average length of imprisonment for defendants whose primary guideline was § 2K2.1 with a final offense level 20 and a Criminal History Category III was 45 months, with a median length of imprisonment imposed being 41 months.[2]

### D.  Additional Crimes

About three and one-half months after he pled guilty to being a felon in possession of a loaded firearm, and while still in pretrial detention, Defendant committed two additional crimes: (1) he possessed an illegal weapon (*i.e.*, a jail-made shiv); (2) which he used (in concert with three other armed detainees) to assault Detainee Isaiha Waulk, resulting in Waulk's death.  ECF No. 24-3.  Surveillance video shows what occurred in Defendant's dormitory in under two and a half minutes resulting in the death of Detainee Waulk:[3]

- The A-6 General Housing Unit is a square room with a large, open common area lined with cells on the first and second floor.  Second floor cells are accessible by

---

[1] Although Defendant committed the current offense while under a criminal justice sentence, because his criminal history score was less than seven points, no additional points were added.  ECF No. 16, ¶ 32 (citing U.S.S.G. § 4A1.1(e)).

[2] The average and median length of imprisonment had Defendant remained a total offense level of 17 would have been 29 and 30 months, respectively.

[3] The surveillance video is without sound.

6

(1:25CR33)

ascending one of two stairways situated on either side of the unit, to an open-air balcony area.

- 5:00:18 p.m.: Walking along the second floor balcony, Corrections Officer Michael Bently begins to unlock cell doors, (ECF No. 24-3).  Waulk is the first to exit his cell. Almost immediately after exiting his cell, Waulk attacked another detainee who had exited his cell, Michael Robinson-Brown, with a knife-like weapon called a shiv. Waulk struck Robinson-Brown in the chest area.  Robinson-Brown escaped further attack by moving to the other side of the balcony.



(Surveillance Video, ECF No. 24-1, at 5:00:18 p.m.).

- 5:00:21 p.m.: Waulk attempts to open two cell doors, but the detainees inside held the doors closed, preventing Waulk from entering.



(Surveillance Video, ECF No. 24-1, at 5:00:21 p.m.).

7

(1:25CR33)

- 5:00:26 p.m.: Waulk shoves past CO Bentley and walks towards the stairs. At that time, Defendant (circled in red) opens his cell door and begins walking out into the common area.



(Surveillance Video, ECF No. 24-1, at 5:00:26 p.m.).

- 5:00:36 p.m.: Waulk runs down the stairs and, apparently unprovoked, attacks Defendant with his shiv.



(Surveillance Video, ECF No. 24-1, at 5:00:36 p.m.).

- 5:00:38 p.m.: Defendant evades Waulk by running and moves towards his cell. The door to Defendant's cell is open (circled in red), making it possible for Defendant to

(1:25CR33)

re-enter his cell and fully retreat from harm.



(Surveillance Video, ECF No. 24-1, at 5:00:37 p.m.).



(Surveillance Video, ECF No. 24-1, at 5:00:38 p.m.).

- 5:00:47–5:00:49 p.m.: For approximately 27 seconds, Defendant stands in the open doorway of his cell, touches his back, and appears to realize that he is bleeding.



(Surveillance Video, ECF No. 24-1, at 5:00:47 p.m.).

(1:25CR33)



(Surveillance Video, ECF No. 24-1, at 5:00:48 p.m.).



(Surveillance Video, ECF No. 24-1, at 5:00:49 p.m.).

- 5:01:04 p.m.: After standing in the doorway of his cell for 27 seconds, Defendant leaves his cell and walks up the stairs to the balcony area, away from Waulk (who is pacing the first floor of the common area).



(Surveillance Video, ECF No. 24-1, at 5:01:04 p.m.)

10

(1:25CR33)



(Surveillance Video, ECF No. 24-1, at 5:01:06 p.m.).

- 5:01:39 p.m.: Defendant stayed on the second-floor balcony for approximately 50 seconds.  While there, Defendant (circled in red) ties up his long hair and walks toward the stairs going down into the common area.



(Surveillance Video, ECF No. 24-1, at 5:01:38 p.m.).

- 5:02:01 p.m.: Defendant descends the stairs and walks past his open cell door (circled in red), towards Waulk, who is still pacing the common area.



(Surveillance Video, ECF No. 24-1, at 5:02:01 p.m.).

11

(1:25CR33)

- 5:02:10 p.m.: Although he is bleeding from his injury, Defendant along with three other detainees (including Robinson-Brown) begin circling and chasing Waulk around the common area.  Each is armed with a shiv—knife-like weapons.





(Surveillance Video, ECF No. 24-1, at 5:02:10 p.m.).

- 5:02:19 p.m.: Defendant and the other detainees chase Waulk towards the showers, where he falls.  Defendant and the other detainees stab and beat Waulk.  They move Waulk to underneath the stairwell, where they continue to assault him viciously.



(Surveillance Video, ECF No. 24-1, at 5:02:19 p.m.).

(1:25CR33)

- 5:02:39 p.m.: As Waulk is lying motionless beneath the stairwell, Defendant lifts his leg and stomps on Waulk's head with such force that Waulk's head bounces off the concrete floor.



(Surveillance Video, ECF No. 24-1, at 5:02:39 p.m.).

- 5:02:45 p.m.: Defendant walks away from Waulk, tucking his shiv into his waistband (circled in red).



(Surveillance Video, ECF No. 24-1, at 5:02:45 p.m.).

Several minutes later, NEOCC personnel arrived and attempted to administer aid to

Waulk who was pronounced dead when he reached the hospital.  The jail-made weapons used in

(1:25CR33)

the attack were later confiscated and surrendered to Youngstown, Ohio Police for investigation.

ECF No. 24-3.

## III.    DISCUSSION

### A. *The Government Satisfied its Burden to Prove by a Preponderance of the Evidence That Defendant Breached the Plea Agreement Without Justification.*

#### 1. *Defendant breached the plea agreement.*

The Sixth Circuit has long treated plea agreements as contracts subject to general principles of contract interpretation. *United States v. Estrada-Gonzalez*, 32 F.4th 607, 610–11 (6th Cir. 2022); *United States v. Wells*, 211 F.3d 988, 995 (6th Cir. 2000) (citing *United States v. Robison*, 924 F.2d 612, 613 (6th Cir. 1991)).  Because plea agreements also implicate constitutional protections, the Government is held to a meticulous standard of performance and ambiguities are construed in the defendant's favor. *Estrada-Gonzalez*, 32 F.4th at 611; *United States v. Moncivais*, 492 F.3d 652, 662 (6th Cir. 2007).  Defendants who breach plea agreements forfeit the right to enforce any provision therein. *United States v. Ellis*, 470 F.3d 275, 284 (6th Cir. 2006) (quoting *Wells*, 211 F.3d at 995).  The Government bears the burden to prove that Defendant breached the plea agreement by a preponderance of the evidence. *Adkins v. United States*, 131 F. App'x 456, 458 (6th Cir. 2005) (citing *United States v. Benjamin*, 138 F.3d 1069, 1073 (6th Cir. 1998)).  It need not prove Defendant's guilt (or that he was not acting in self-defense) beyond a reasonable double. *See id.*

By entering the plea agreement, Defendant acknowledged that he understood that committing additional crimes constituted a breach that would release the Government from its obligations under the agreement. ECF No. 12, ¶ 26.  As indicated above, during the plea colloquy, the Court explained the consequences of a breach and Defendant attested that he understood them.  Because the breach provision is unambiguous, the Court gives the text its

14

(1:25CR33)

plain and usual meaning.  _United States v. Rodriguez_, 797 F. App'x 933, 942 (6th Cir. 2019)

(citing 17 Am. Jur. 2d Contracts § 325 ("unambiguous contractual language is conclusive upon

the parties and the courts.")).

Killing another human being is indisputably a crime.[4]  The Government produced

evidence (_e.g._, a surveillance video, incident report, etc.) showing Defendant and others illegally

possessed and used jail-made, knife-like weapons to assault Waulk.  ECF No. 24-3.  When

Waulk was lying motionless beneath the stairwell, Defendant kicked him and then stomped

Waulk's head so violently that it bounced off the concrete floor.  ECF No. 24-1.  Waulk died

because of the assault.  This evidence satisfies the Government's burden to prove by a

preponderance that Defendant committed two new crimes after pleading guilty.

### 2. _Defendant's self-defense argument fails._

Defendant does not contest his involvement in the assault that resulted in Waulk's death.

_See_ ECF No. 28.  Instead, he argues he acted in self-defense.[5]  As explained above, the

Government need only prove by a preponderance of the evidence that Defendant did not act in

self-defense.  _See Adkins_, 131 F. App'x at 458.  During the sentencing hearing, Defendant

---

[4] Under Ohio law, it is unlawful to: (a) purposefully or knowingly cause the death of another; or (b) cause the death of another person as a proximate result of committing or attempting to commit a felony.  Ohio Rev. Code § 2903.02 (murder).  It is also unlawful to knowingly cause the death of another or do so while under the influence of sudden passion or sudden fit of rage provoked by the victim.  Ohio Rev. Code § 2903.03 (voluntary manslaughter).

[5] Under Ohio law, a defendant claiming self-defense bears the burden to prove by a preponderance of the evidence that he acted in self-defense.  Ohio Rev. Code § 2901.05(A).  If that burden is satisfied, the burden shifts to the state to prove beyond a reasonable doubt that the defendant did not act in self-defense.  Ohio Rev. Code § 2901.05(B)(1).

(1:25CR33)

claimed he had "no choice" but to arm himself and participate in the assault against Waulk, who

attacked him first without provocation.  Defendant's argument elides the truth.

According to the Ohio Supreme Court, a defendant asserting self-defense must

demonstrate that:

> (1) he was not at fault in creating the situation that led to the affray,
> (2) had a "bona fide belief" that he was "in imminent danger of death
> or great bodily harm" and his only way to escape was by using force,
> and (3) he did not violate a duty to retreat.

*State v. Palmer*, 174 Ohio St.3d 561, 2024-Ohio-539, ¶ 23 (Ohio 2024) (internal citation

omitted).  A person has no duty to retreat, if that person is in a place that he has a lawful right to

occupy.  *Id*. (citing Ohio Rev. Code § 2901.09(B)).

The surveillance video makes clear that Defendant may have had an argument for self-

defense at 5:00:36 p.m., when Waulk, apparently unprovoked, charged at him with a weapon and

chased Defendant around the common area.  ECF No. 24-1.  Defendant likely had a *bona fide*

belief that he was in imminent danger of death or great bodily harm because Waulk lunged at

him with a shiv.  Waulk stabbed or struck Defendant in the back, causing Defendant to bleed

through his shirt.  ECF No. 24-1, at 5:00:36 p.m.  Defendant did not violate his duty to retreat

when attacked by Waulk.  Rather, he ran back to his cell, evading further injury.  ECF No. 24-1,

at 5:00:37 p.m.  Defendant's self-defense argument fails *after* his safe return to his cell at 5:00:38

p.m. where he remained undisturbed for 27 seconds.

Once Defendant escaped Waulk's attack and returned to his cell, Defendant could have

stayed there.  He could have entered his cell and secured the door, as other detainees had done

when Waulk approached them wielding a weapon.  *See* ECF No. 24-1, at 5:00:21 p.m. (showing

Waulk attempt to open two second-floor cell doors while those inside held the doors shut,

denying Waulk entry).  Rather than avoiding further interaction with Waulk, Defendant, after

(1:25CR33)

standing in the doorway of his cell for 27 seconds, made a decision.  He left the safety of his cell and walked up the stairs to the balcony, where he remained for 50 seconds.  ECF No. 24-1, at 5:00:37 p.m.–5:01:04 p.m. and 5:01:04 p.m.–5:01:54 p.m.  Waulk did not chase or even appear to notice Defendant's ascent.  For the second time, after having been attacked by Waulk, Defendant was safe.  He could have remained on the balcony, out of the fray.

In just under one minute from Waulk's initial attack on him, Defendant made another decision.  This one was life-changing for himself and Waulk.  Defendant restrained his hair but not his passion and descended the stairs to the common area, illegal weapon in hand.  He walked past his open cell directly towards Waulk who was being flanked by three other detainees approaching from the opposite stairwell.  ECF No. 24-1, at 5:02:01 p.m. and 5:02:10 p.m.

Defendant became the aggressor.  He assumed a fighting stance and attacked and chased Waulk around the common area.  ECF No. 24-1, at 5:02:10 p.m.  Defendant ignored every opportunity to retreat (again) from the situation and return to safety.  Instead, Defendant participated in initiating the assault that resulted in Waulk's death.  Moreover, when Waulk was lying motionless under the stairs and no longer posing a threat, Defendant stomped on Waulk's head so violently that Waulk's head bounced off the concrete floor.  ECF No. 24-1, at 5:02:39 p.m.  Walking away and leaving an unmoving Waulk under the stairwell, Defendant hid his illegal weapon in his waistband.  ECF No. 24-1, at 5:02:45 p.m.

Based on this record, only one conclusion is reasonable.  Therefore, the Court concludes that a preponderance of the evidence demonstrates that Defendant was not acting in self-defense when he assaulted Waulk.  Defendant's assault and use of an illegal weapon are additional crimes.  By committing those additional crimes after having entered the plea agreement,

(1:25CR33)

Defendant breached the plea agreement.  The Government's motion to be released from its

obligations is granted.

### B.  Defendant is not Entitled to an Acceptance of Responsibility Reduction Under U.S.S.G. § 3E1.1.

Under the advisory sentencing guidelines, a district court may apply a two-level

reduction if "the defendant clearly demonstrates acceptance of responsibility for his offense."

*United States v. Merritt*, 102 F.4th 375, 378 (6th Cir. 2024) (citing U.S.S.G. § 3E1.1(a)).  The

defendant bears the burden of showing by a preponderance of the evidence that he has accepted

responsibility for the crime charged.  *United States v. Williams*, 940 F.2d 176, 181 (6th Cir.

1991).  Whether a defendant has accepted responsibility is a question of fact within the sound

discretion of the district court.  *United States v. Watkins*, 86 F. App'x 934, 937–38 (6th Cir.

2004); *Merritt*, 102 F.4th at 382 (noting that a defendant must offer evidence beyond the fact that

they plead guilty).

Evidence of a defendant's acceptance of responsibility "may be outweighed by conduct

of the defendant that is inconsistent with such acceptance."  U.S.S.G. § 3E1.1, App. Note 3.

Application Note 1 lists seven, non-exhaustive factors that district courts may consider when

determining whether a defendant has accepted responsibility, including "voluntary cessation of

criminal conduct or associations."  U.S.S.G. § 3E1.1, App. Note 1.  Continued criminal conduct

is inconsistent with the acceptance of responsibility.  *See United States v. Webb*, 335 F.3d 534,

538 (6th Cir. 2003) (holding a § 3E1.1 reduction denial was appropriate because defendant

continued drug trafficking after the initial search warrants were executed); *United States v.*

*Castillo-Garcia*, 205 F.3d 887, 889 (6th Cir. 2000) (denying the § 3E1.1 reduction is

"particularly appropriate" when the "defendant is a repeat offender of the same statute.").

18

(1:25CR33)

The Sixth Circuit requires post-plea agreement criminal conduct to be relevant or connected to the charged crime before a defendant loses the acceptance of responsibility reduction under § 3E1.1.  *United States v. Jett*, 154 F.4th 459, 467 (6th Cir. 2025) (citing *United States v. Banks*, 252 F.3d 801, 806–07 (6th Cir. 2001)) (holding that a defendant attempting to smuggle synthetic drugs into prison during pretrial detention was sufficiently connected to his charged drug trafficking offenses to deny the § 3E1.1 reduction).  New criminal conduct is relevant to the charged offense if it is: (1) the same type as the underlying offense; (2) the motivating force behind the underlying offense; (3) related to actions towards a government witness; or (4) strongly linked with the underlying offense.  *United States v. Finch*, 764 F. App'x 533, 536 (6th Cir. 2019) (quoting *United States v. Morrison*, 983 F.2d 730, 735 (6th Cir. 1993)). In *Finch*, the defendant had been charged with bank robbery and his prison fight was associated with an attempt to rob a fellow inmate.  *Id*. at 536.  The Sixth Circuit affirmed the district court's decision not to apply the acceptance of responsibility reduction, concluding that Finch's pretrial detention conduct was sufficiently connected to his underlying indictment.  *Id*.

At the sentencing hearing in this case, both Defendant and the Government argued that Defendant's new crime was unrelated to the underlying conviction and that Defendant was still entitled to a two-level acceptance of responsibility reduction under § 3E1.1(a).  The Court disagrees.

Defendant was indicted under § 922(g)(1) because he unlawfully possessed a firearm and ammunition.  ECF No. 1.  In assessing a different section of 922(g), § 922(g)(8), the Supreme Court held that an "individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment."  *United States v. Rahimi*, 602 U.S. 680, 702 (2024) (citing *District of Columbia v. Heller*, 554 U.S. 570, 626–27

(1:25CR33)

(2008)).  Similarly, federal and state law prohibits inmates from possessing "prohibited object[s]," which includes "a firearm or destructive device or . . . a weapon . . . or an object that is designed or intended to be used as a weapon."  18 U.S.C. § 1791(d)(1)(A); see Ohio Admin. Code § 5120-9-06(C)(42) (prohibiting possession of a weapon).  Both statutes seek to keep weapons from dangerous individuals to ensure community safety.  The incident report in this case also makes clear that the weapons used by Defendant and the others were contraband illegally possessed during detention.  See ECF No. 24-3 at PageID #: 159 (reporting that all four detainees who attacked Waulk were armed with illegal, jail-made shivs); ECF No. 24-1, at 5:02:45 p.m.

There is no reasonable distinction between § 922(g)'s goal of prohibiting a felon convicted of armed robbery from possessing an illegal firearm and rules or statutes prohibiting a detainee awaiting sentencing from possessing an illegal shiv.  In both the underlying offense and during the NEOCC incident, Defendant had a weapon he was prohibited from possessing because of the risk of harm to others.  That Defendant used a prohibited weapon while at NEOCC, resulting in the death of another detainee, only underscores this commonality.  His failure to comply with the weapons prohibition during pretrial detention is consistent with his offense conduct in violation of § 922(g) and inconsistent with acceptance of responsibility.  Consequently, Defendant is not entitled to a two-level reduction under § 3E1.1(a), nor is he permitted to seek a third level reduction under § 3E1.1(b).[6]  Accordingly, Defendant's final

---

[6] Defendant may only receive a one-level reduction under § 3E1.1(b) if he first qualifies for the two-level reduction under § 3E1.1(a).  As explained herein, Defendant's conduct is inconsistent with acceptance of responsibility and, therefore, he is not entitled to any reduction.

(1:25CR33)

offense level is 20 with a Criminal History Category III, resulting in a Sentencing Guideline range of 41–51 months.  U.S.S.G. § 5A.

### C.  The § 3553(a) Factors Support an Upward Variance.

Even if Defendant were entitled to an acceptance of responsibility reduction under § 3E1.1, the factors under 18 U.S.C. § 3553(a) support an upward variance as imposed.  The sentencing guidelines are advisory, and district courts need only consider the recommended sentence ranges.  *United States v. Booker*, 543 U.S. 220, 264 (2005).  Courts must also balance the factors set forth in § 3553(a) and impose a sentence "sufficient, but not greater than necessary" to fulfill the purposes of sentencing.  *United States v. Lanning*, 633 F.3d 469, 474 (6th Cir. 2011); 18 U.S.C. § 3553(a).

The § 3553(a) factors pertinent to Defendant's case include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2) the need for the sentence imposed –

>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

>> (B) to afford adequate deterrence to criminal conduct;

>> (C) to protect the public from further crimes of the defendant; and

>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

> . . .

> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

21

(1:25CR33)

18 U.S.C. § 3553(a).  The Court's obligation to balance applicable factors necessarily implies that the Court cannot attribute unreasonable weight to any one of the pertinent factors, including punishment.  *See United States v. Johnson*, 680 F. App'x 451, 455 (6th Cir. 2017).  Still, the § 3553(a) factors are not intended to shelter abhorrent, anti-social behavior.  "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court . . . may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661; *Concepcion v. United States*, 597 U.S. 481, 492 (2022) (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972)) ("a federal judge in deciding to impose a sentence 'may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.'").

First, regarding § 3553(a)(1), the Court considers the nature and circumstances of the offense.  Defendant pleaded guilty to being a felon in possession of a firearm.  ECF No. 1.  As explained above, when an individual is found to pose a danger to others and the community, Congress has seen fit to limit such an individual's access to firearms.  *See Rahimi*, 602 U.S. at 702; 18 U.S.C. § 922(g)(1).  Defendant was previously convicted for robbing two banks and a gas station at gun point.  *United States v. Smith*, 1:16-cr-204, ECF No. 12 (N.D. Ohio Sept. 19, 2016) (Adams, J.).  That he unlawfully possessed a firearm less than six months into his supervised release for that crime is troubling.

Next, when considering Defendant's character and background, there are some mitigating circumstances.  Defendant never met his father.  ECF No. 16, ⁋ 38.  Although he is not close with his siblings, he claims he was close with his mother.  ECF No. 16, ⁋⁋ 41–43.  While battling cancer, his mother turned to self-medicating with street drugs and overdosed on fentanyl in 2023, leaving her unable to speak and reliant on a feeding tube.  ECF No. 16, ⁋ 41.  He earned his GED

22

(1:25CR33)

in 2020 while incarcerated (ECF No. 16, ¶ 56) and is still relatively young at only 29 years old. Defendant was diagnosed with, and began taking medication for, a major depressive disorder and unspecified psychosis in 2024.  ECF No. 16, ¶¶ 47–48.  Except for working at Chipotle for a brief period, Defendant was unemployed since his release from federal prison, though during the sentencing hearing he claimed to have submitted 180 job applications.  His effort to become employed is commendable

Mitigating circumstances aside, Defendant's criminal history and pretrial behavior weigh in favor of an upward variance.  In contrast to his sparce employment record, Defendant's criminal history is extensive and demonstrates escalating severity, beginning with criminal trespass at age 15, to armed robbery at age 20, to an assault resulting in death at age 29.  *See* ECF No. 16, ¶¶ 27–30.  Less than six months into a three-year term of supervised release, Defendant was arrested for unlawfully possessing a firearm.  He also possessed methamphetamine when arrested.  ECF No. 16, ¶¶ 7–11.  *See Smith v. United States*, 508 U.S. 223, 240 (1993) ("drugs and guns are a dangerous combination.").  Moreover, and in further violation of his supervised release conditions (*see Smith*, No. 1:16-cr-204, ECF No. 74 (Jan. 17, 2017), Standard Condition of Supervision No. 8), he was in a vehicle with open containers of alcohol.  ECF No. 16, ¶¶ 7–11.  At the sentencing hearing, the Court acknowledged Defendant's mental health conditions but concluded there was no indication he was under diminished capacity when he sat, armed and possessing narcotics, in the back seat of the Jeep next to another armed felon.

Although Defendant agreed to plead guilty in this case, his statement accepting responsibility was brief: "I acknowledge the facts in the plea agreement.  I made a bad decision. I was at the wrong place at the wrong time with the wrong people."  ECF No. 16, ¶ 14. Defendant's contrition falls flat against his continued criminality.  Less than four months after

23

(1:25CR33)

pleading guilty, Defendant again obtained an illegal weapon.  This time, he used that weapon to attack and kill another detainee.  ECF No. 24.  Accordingly, the nature of the underlying offense and Defendant's history and characteristics justify an upward variance.

Next, the Court must balance these factors with the need to achieve the four enumerated sentencing goals in § 3553(a)(2).  As discussed at length herein, Defendant's underlying crime in this case is serious, in particular because his prior conviction for armed robbery also involved a firearm.  See *Smith*, 1:16-cr-204, ECF No. 43 (Sept. 19, 2016).  Defendant's conduct before, during, and after his arrest demonstrates a lack of respect for the law.  He violated federal law and the terms of his supervised release by possessing a loaded firearm and narcotics and associating with another engaged in criminal activity.  See *Smith*, No. 1:16-cr-204, ECF No. 74 (Jan. 17, 2017), Standard Condition of Supervision No. 8.  During the traffic stop, law enforcement officers twice asked Defendant if he was armed before he admitted that he was carrying a firearm.  ECF No. 16, ⁋ 8–9.  Such conduct does not demonstrate respect for the law.

The sentence must provide sufficient deterrence from criminal conduct, which is of particular concern in this case because Defendant's recidivism continued during pretrial detention.  Indeed, his violent behavior escalated, resulting in a man's death.  Defendant's recidivistic behavior is persistent and carries severe consequences for himself and others.  He has shown little respect for the law—even while in custody—and demonstrated a continuing safety risk to others and the community.

In addition to the foregoing considerations, § 3553(a)(6) cautions district courts "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  The average length of incarceration for similarly situated defendants (individuals with an offense level 20 and a Criminal History Category III) is 45 months with a

(1:25CR33)

median length of 41 months.  But Defendant is not an average, median, or run-of-the-mill

offender.  His recidivism, escalating violence, and noncompliance with the law even while in

custody demonstrates that the recommended 41–51 month sentencing guidelines range is

insufficient to fulfill the purposes of sentencing.  If Defendant chose not to maintain lawful

behavior while detained and facing a two and a half year sentence, an upward variance is an

appropriate response.  As the record reflects, the Court imposed a sentence well below the

statutory maximum.  These circumstances provide compelling justification to vary upward, and

the Court concludes that a sufficient, not greater than necessary sentence is satisfied with a 96-

month term of incarceration.

The three-year term of supervised release with certain conditions were also thoughtfully

imposed.  They will allow the Court to provided needed services and boundaries to promote

Defendant's successful reentry.

Defendant's sentence shall run consecutively to any sentence imposed relating to his

supervised release violation.  This is consistent with U.S.S.G. § 5G1.3(d), which provides: "In

any other case involving an undischarged term of imprisonment, the sentence for the instant

offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior

undischarged term of imprisonment to achieve a reasonable punishment for the instant offense."

U.S.S.G. § 5G1.3(d).  Furthermore, Application Note 4(C) recommends that sentences for

offenses committed while a defendant is on supervised release should "be imposed consecutively

to the sentence imposed for the revocation."  U.S.S.G. § 5G1.3(d) Application Note 4(C).

Accordingly, Defendant's sentence shall run consecutively to any sentence imposed for his

supervised release violation relating to Case No. 1:16CR204-JRA

(1:25CR33)

Finally, district courts have discretion to impose federal sentence consecutive to anticipated state sentences that have not yet been imposed.  *See Setser v. United States*, 566 U.S. 231, 236 (2012).  Therefore, Defendant's sentence shall run consecutively to any state sentence imposed regarding charges that may be brought against Defendant for the August 31, 2025 assault resulting in Waulk's death.

## IV.    CONCLUSION

For the reasons set forth on the record during the sentencing hearing and herein, the Court exercises its discretion to vary upwards.  Defendant is sentenced to a term of incarceration of 96 months.  Upon release, Defendant shall serve a three-year term of supervised release as to Count 1 of the Indictment, with the mandatory, standard, and special conditions of supervision imposed.

Defendant's sentence shall run consecutively to any new term of incarceration imposed for his supervised release violation in Case No. 1:16CR204-JRA.

The sentence shall also run consecutively to any sentence imposed resulting from charges that may be brought against Defendant for the August 31, 2025 assault resulting in Waulk's death.

The Court waives a fine, concluding that Defendant cannot afford to pay it.  A $100.00 special assessment is imposed, and is due immediately.


IT IS SO ORDERED.


| December 6, 2025 | /s/ Benita Y. Pearson |
| Date | Benita Y. Pearson |
| | United States District Judge |